# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA,      )  Case No. 2:24-cr-00052-MAK-1
                               )
                Plaintiff,     )  Courtroom 13B
                               )  U.S. Courthouse
v.                             )  601 Market Street
                               )  Philadelphia, PA 19106
PATRICK KNAUSS,                )
                               )  June 18, 2024
                Defendant.     )  11:00 a.m.
```

### TRANSCRIPT OF CHANGE OF PLEA HEARING
### BEFORE HONORABLE MARK A. KEARNEY
### UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:              U.S. Attorney's Office
                                By:  KELLY M. HARRELL, ESQ.
                                615 Chestnut Street
                                Suite 1250
                                Philadelphia, PA 19106-4476


For the Defendant:              THOMAS A. DREYER, ESQ.
                                30 Running Brook Road
                                Glen Mills, PA 19342


ESR Operator/Deputy Clerk:      MICHAEL BECK

TRANSCRIPTION SERVICE:          **TRANSCRIPTS PLUS, INC.**
                                435 Riverview Circle
                                New Hope, Pennsylvania 18938
                                215-862-1115
                                CourtTranscripts@aol.com


Proceedings recorded by electronic sound recording, transcript
Produced by transcription service.

2

**INDEX**

                                                            **PAGE**

Defendant sworn                                               5

The Court conducts Rule 11 colloquy with Defendant           6

Ms. Harrell summarizes the essential terms                   15

The Court continues Rule 11 colloquy with Defendant          19

Ms. Harrell summarizes the elements of the offenses
charged in the indictment                                    35

The Court continues Rule 11 colloquy with Defendant          37

Ms. Harrell summarizes the facts the Government
believes would show the defendant guilty of the
three charges                                                38

The Court continues Rule 11 colloquy with Defendant          50

The Court inquires of attorneys as to the factual
basis for the plea, the Defendant's competency
and willingness, etc.                                        51

The Court finds the Defendant competent and capable
of entering an informed plea                                 52

The Defendant enters a plea of guilty as to
Counts 1,2 and 3 of the indictment                           54

The Court accepts the plea                                   54

 1              COURTROOM DEPUTY:  All rise.  Court is now in
 2   session.  The Honorable Mark A. Kearney presiding.
 3              THE COURT:  Good morning.  Please be seated.
 4              MR. DREYER:  Good morning, Your Honor.
 5              MS. HARRELL:  Good morning, Your Honor.
 6              THE COURT:  We're here this morning as you prepare
 7   for the August 27, 2024 trial to consider a possible
 8   disposition short of trial.
 9              May I have entry of appearance, first for the United
10   States.
11              MS. HARRELL:  Yes.  Good morning, Your Honor.  Kelly
12   Harrell on behalf of the United States.  And along with me at
13   counsel table is Special Agent Leslie Trawick from FBI.
14              THE COURT:  Welcome; thank you.
15              MS. HARRELL:  Thank you.
16              THE COURT:  And on behalf of Mr. Knauss -- or Knauss?
17              MR. DREYER:  Good morning, Your Honor.  Thomas A.
18   Dreyer on behalf of Patrick Knauss, who is seated to my left.
19              THE COURT:  Welcome, Mr. Knauss.
20              MR. KNAUSS:  Hello.
21              THE COURT:  Mr. Knauss, do you know why you're here
22   today?
23              MR. KNAUSS:  Yes, Your Honor.
24              THE COURT:  Okay.  Counsel for the United States,
25   this case involves, as both of us know, several victims.

1          MS. HARRELL:  Yes.

2          THE COURT:  Have they been advised under the Crime

3    Victims' Act of their rights today?

4          MS. HARRELL:  Yes, Your Honor.  The victims who we've

5    been able to identify have been notified of today, and they did

6    not choose to come today.

7          THE COURT:  Okay.  They've been notified by how?

8          MS. HARRELL:  Our agent spoke to one set of parents,

9    and the others who are previously identified victims,

10   identified by the National Center for Missing and Exploited

11   Children have been identified [sic] by letter.

12         THE COURT:  Okay, fine.  All right.

13         Mr. Knauss, over the next few moments, I'm going to

14   explain a number of things to you as you consider whether to

15   plead guilty to the charges here today.  If at any time you

16   don't understand my questions -- I'm not Judge Scott, in case

17   you want to know.  In case you don't understand my questions,

18   or you don't understand what I'm saying, please stop me.  Do

19   you understand?

20         MR. KNAUSS:  Yes.

21         THE COURT:  It's most important you and I understand

22   each other today.  If we don't understand each other, then I'm

23   going to have a tough time finding you have a knowing and

24   voluntary waiver of any rights.  So please tap your counsel and

25   he can interrupt me at any time.  Do you understand that?

1            MR. KNAUSS:  Yes.

2            THE COURT:  We're going to use a lot of words you

3 don't use every day in your life.  We're lawyers.  We're going

4 to talk about terms that we use in the law.  If you don't

5 understand those words, please stop us.  Do you understand

6 that?

7            MR. KNAUSS:  Yes.

8            THE COURT:  Okay.  If, any time, you want to talk to

9 your lawyer, you may do so.  Do you understand that?

10           MR. KNAUSS:  Yes.

11           THE COURT:  Okay.  Mr. Deputy, would you kindly swear

12 Mr. Knauss?

13           COURTROOM DEPUTY:  Please stand and raise your right

14 hand.

15                  PATRICK KNAUSS, DEFENDANT, SWORN

16           COURTROOM DEPUTY:  Please state your name for the

17 record.

18           MR. KNAUSS:  Patrick Knauss.

19           COURTROOM DEPUTY:  Please be seated.

20           THE COURT:  Mr. Knauss, you've just sworn an oath,

21 and that means if the United States believes you've answered a

22 question falsely, consistent with federal law, they could

23 prosecute you for perjury, which is an offense separate than

24 the one you're here for.  Do you know that, sir?

25           MR. KNAUSS:  Yes.

1            THE COURT:  Are you going to tell me the truth?

2            MR. KNAUSS:  Yes.

3            THE COURT:  Okay.  Sir, what is your full name?

4            MR. KNAUSS:  Patrick John Knauss.

5            THE COURT:  Okay.  Have you ever used any other name?

6            MR. KNAUSS:  No.

7            THE COURT:  Any nickname?

8            MR. KNAUSS:  No.

9            THE COURT:  How old are you?

10           MR. KNAUSS:  35.

11           THE COURT:  Did you attend school in the United

12   States?

13           MR. KNAUSS:  Yes.

14           THE COURT:  How far did you complete?

15           MR. KNAUSS:  Bachelors degree.

16           THE COURT:  In what subject?

17           MR. KNAUSS:  Restaurant and beverage management from

18   New England Culinary Institute in Montpelier, Vermont.

19           THE COURT:  Okay.  Do you speak, or write, or fluent

20   in any other language other than English?

21           MR. KNAUSS:  No.

22           THE COURT:  Okay.  Have you ever been treated for a

23   drug addiction?

24           MR. KNAUSS:  No.

25           THE COURT:  Have you ever been treated for an alcohol

1  addiction?

2          MR. KNAUSS:  No.

3          THE COURT:  Have you ever been treated for a mood

4  disorder, such as clinical anxiety or depression?

5          MR. KNAUSS:  Yes.

6          THE COURT:  How long ago?

7          MR. KNAUSS:  May 4th, 2023.

8          THE COURT:  May 4th of 2023?

9          MR. KNAUSS:  Yeah.

10          THE COURT:  Did you enter a facility?

11          MR. KNAUSS:  It was outpatient.

12          THE COURT:  Okay.  For one day?

13          MR. KNAUSS:  I was there for one day on a suicide

14  attempt regarding the arrest in this case.

15          THE COURT:  Okay.  Had you already been arrested?

16          MR. KNAUSS:  I was arrested that morning.

17          THE COURT:  Okay.

18          MR. KNAUSS:  I was brought to UVM Medical Facility in

19  Burlington, Vermont.

20          THE COURT:  And at that stage, you had attempted --

21          MR. KNAUSS:  I was --

22          THE COURT:  You made an attempt?

23          MR. KNAUSS:  -- feeling very suicidal due to that

24  arrest.  The officer that was handling that reached out to the

25  First Step Act in a -- which is a local organization in

1  Vermont.  Under their recommendation, I was brought to UVM

2  psych ward and met with Dr. Ross.

3          THE COURT:  Okay.  Are you still receiving treatment

4  for a mood disorder?

5          MR. KNAUSS:  I'm taking Effexor once a day, which is

6  an antidepression/antianxiety pill at 150 milligrams.

7          THE COURT:  Before that date, had you ever wrestled

8  with depression or anxiety?

9          MR. KNAUSS:  Yes.

10          THE COURT:  Okay.  Had you ever been treated for that

11  before that date?

12          MR. KNAUSS:  No.

13          THE COURT:  Okay.  Have you ever been treated for a

14  mental illness, such as schizophrenia, bipolar, or other type

15  of mental disorder?

16          MR. KNAUSS:  No.

17          THE COURT:  Okay.  Are you presently being treated --

18  are you present receiving the medication you need at the

19  facility?

20          MR. KNAUSS:  Yes.

21          THE COURT:  Okay.  Are you feeling capable of

22  answering our questions today?

23          MR. KNAUSS:  Yes.

24          THE COURT:  Okay.  Sir, this case arises from a

25  charge brought against you by our grand jury -- let me just

1    make sure -- by way of an indictment.  Are you aware of that

2    sir?

3                MR. KNAUSS:  Yes.

4                THE COURT:  Have you had a chance to review that

5    indictment?

6                MR. KNAUSS:  Yes.

7                THE COURT:  Okay.  Have you had a chance to review it

8    with your lawyer?

9                MR. KNAUSS:  Yes.

10               THE COURT:  Do you understand the charges that are

11   listed in that indictment.

12               MR. KNAUSS:  I do, yes.

13               THE COURT:  Okay.  Has your lawyer answered all your

14   questions about what's in the indictment?

15               MR. KNAUSS:  Yes, thoroughly.

16               THE COURT:  Okay.  Has he fully explained your rights

17   to go to trial in August the 27th -- on August 27th?

18               MR. KNAUSS:  Yes.

19               THE COURT:  Has he answered all your questions about

20   what the words in this indictment mean?

21               MR. KNAUSS:  Yes.

22               THE COURT:  Okay.  Has he described to you what a

23   potential penalty or sentence could be if you -- should you

24   plead guilty?

25               MR. KNAUSS:  Yes.

1        THE COURT:   Is there anything your lawyer -- you

2   asked your lawyer to do and he did not?

3        MR. KNAUSS:   Nope.

4        THE COURT:   Are you satisfied with the representation

5   provided by your lawyer?

6        MR. KNAUSS:   Absolutely, yes.

7        THE COURT:   Do you have any questions of me about

8   anything in the indictment?

9        MR. KNAUSS:   Not at this time.

10       THE COURT:   Okay.  Has anyone threatened you or

11  forced you in any way to consider pleading guilty today?

12       MR. KNAUSS:   No.

13       THE COURT:   Okay.  If you do so, are you pleading

14  guilty of your own free will?

15       MR. KNAUSS:   Yes.

16       THE COURT:   Okay.  I don't know, sir, whether you

17  have any earlier criminal record, but should you plead guilty

18  today, and I find you guilty, based on what I hear from the

19  United States, you will be convicted of a felony, do you

20  understand that?

21       MR. KNAUSS:   Yes.

22       THE COURT:   Okay.  And a federal felony will deprive

23  you of certain valuable civil rights.  A couple years ago --

24  now several years ago, I read an article that said there's well

25  over 700 or 800 civil rights that are forfeited by a guilty

1  plea in federal court; most of them may not affect you.  Your

2  Montana -- a fisherman's license may not affect you, but others

3  will.  For example, the ability to vote in certain states will

4  be affected.  The ability to hold a professional license will

5  be affected.  Do you understand that, sir?

6           MR. KNAUSS:  Yes.

7           THE COURT:  Okay.  You will not be able to possess a

8  firearm or ammunition, do you understand that?

9           MR. KNAUSS:  Yes.

10          THE COURT:  Under the present law.  Okay.

11          Ms. Harrell, this case involves a forfeiture as I

12  read it, correctly -- am I correct about that, of some

13  technology?

14          MS. HARRELL:  That's correct, Your Honor.

15          THE COURT:  Right.

16          Sir, do you know what it means when the Government is

17  seeking a forfeiture of certain property?

18          MR. KNAUSS:  Yes.

19          THE COURT:  Okay.  It means you -- they could sell it

20  and you get no proceeds from it.  Do you understand that?

21          MR. KNAUSS:  Yes.

22          THE COURT:  Okay.  Is there -- I didn't see -- and

23  maybe there is -- let me look at the agreement.  Is there a

24  reference to a restitution for this defendant?

25          MS. HARRELL:  Your Honor, restitution is mandatory

1  under the statutes.

2             THE COURT:  Right.

3             MS. HARRELL:  And that is included in the defendant's

4  plea agreement.  At this point in time, there is no restitution

5  agreement.  I know Your Honor is familiar with this case

6  because, of course, you heard the cases of Persons Number 1 and

7  2 in this indictment.

8             THE COURT:  Yes.

9             MS. HARRELL:  And I am -- I would be surprised if any

10 of those victims who sought restitution in that case seek

11 restitution from this defendant, because only one of the

12 victims from the Springside Chestnut Hill community is actually

13 identified as a victim of Mr. Knauss in this case.

14            THE COURT:  Oh.

15            MS. HARRELL:  The other victims who may seek

16 restitution in this case are those who were depicted in some of

17 the defendant's other images, and those are the children who

18 were identified by NCMEC.

19            THE COURT:  Okay.

20            MS. HARRELL:  Okay?

21            THE COURT:  Fine, all right.  Okay.

22            So, do you know what the United States means by

23 restitution, sir?

24            MR. KNAUSS:  Yes.

25            THE COURT:  Okay, all right.  It's my understanding,

1  Mr. Knauss, that you've reached an agreement with the United

2  States to resolve this claim short of trial.  Is that correct?

3              MR. KNAUSS:  Yes.

4              THE COURT:  Okay.  Counsel, do you have a copy of

5  that agreement in front of you?

6              MR. DREYER:  We do, Your Honor.

7              THE COURT:  All right.  Would you kindly direct Mr.

8  Knauss's attention to the -- I believe it's the 14th page of

9  the -- I have a copy of it -- of the guilty plea agreement.  Do

10 you have the original, Counsel?

11             MS. HARRELL:  I have the original, Your Honor.  If --

12             THE COURT:  Oh, all right; thank you.  All right.

13             MS. HARRELL:  Would you like me to hand it up or

14 just --

15             THE COURT:  Well, do you need to look for it -- look

16 through it for the purpose of our discussion?

17             MS. HARRELL:  I have a copy of it I can use, Your

18 Honor.

19             THE COURT:  Yes, would you we kindly hand it up?

20 Thank you.  And does it also attach the acknowledgment of

21 rights, Counsel?

22             MS. HARRELL:  Yes, Your Honor.

23             THE COURT:  Thank you.

24             MS. HARRELL:  Sure.

25             THE COURT:  Mr. Knauss, is that your signature on

1  Page 14 of the guilty plea agreement?

2          MR. KNAUSS:  Yes.

3          THE COURT:  Did you voluntarily sign that document?

4          MR. KNAUSS:  Yes.

5          THE COURT:  Okay.  Counsel, if you would kindly turn

6  back three pages.  Mr. Knauss, is that your signature on Page 3

7  of the document called "Acknowledgment of Rights"?

8          MR. KNAUSS:  Yes.

9          THE COURT:  Did you voluntarily sign that document?

10          MR. KNAUSS:  Yes.

11          THE COURT:  Did you read these documents before you

12  signed them?

13          MR. KNAUSS:  Yes; with my counsel.

14          THE COURT:  Did your counsel go through these

15  documents with you?

16          MR. KNAUSS:  Yes.

17          THE COURT:  Did your counsel thoroughly discussed the

18  plea agreement with you?

19          MR. KNAUSS:  Yes.

20          THE COURT:  Did he explain to you what it means to

21  have an agreement with the United States to make a

22  recommendation to me about an appropriate sentence?

23          MR. KNAUSS:  Yes.

24          THE COURT:  Okay.  Did he explain to you that I do

25  not have to accept that agreement.

1    MR. KNAUSS:  Yes.

2    THE COURT:  Okay.  Did he explain to you that it

3 would be your right if I do not accept that agreement to go to

4 trial in August?

5    MR. KNAUSS:  Yes.

6    THE COURT:  Okay.  Have you had enough time to talk

7 these two documents -- talk about these two documents with your

8 lawyer?

9    MR. KNAUSS:  Yes.

10    THE COURT:  Okay.  Ms. Harrell, I'm going to ask you

11 if you'd now kindly summarize?  I will deal with how Rule 11

12 works here -- Rule 11(c) works here.

13    MS. HARRELL:  Okay.

14    THE COURT:  And I'll also address the mandatory

15 sentences, as well as the appeal rights.

16    MS. HARRELL:  Okay.

17    THE COURT:  But if you can try to address the

18 essential terms.

19    MS. HARRELL:  Okay.  Yes; thank you, Your Honor.

20    Pursuant to the guilty plea agreement, the defendant

21 has agreed to plead guilty to Counts 1, 2, and 3 of the

22 indictment, charging him with conspiracy to manufacture child

23 pornography; conspiracy to receive and distribute child

24 pornography; and receipt of child pornography.

25    The defendant has also acknowledged his waiver of

1  rights, which is set forth in the attachment to the guilty plea

2  agreement.

3      As Your Honor mentioned, and I know you'll review,

4  the parties have entered into this agreement pursuant to

5  Rule 11(c)(1)(C), and agree that the following specific

6  sentence is the appropriate disposition here.  That would be a

7  sentence of imprisonment within a range of 262 to 274 months

8  imprisonment; a period of at least 15 years of supervised

9  release; and a $300 special assessment.

10      And, as I know Your Honor will review, if the Court

11  does not accept that agreement, then the defendant or the

12  Government would have the right to withdraw from the guilty

13  plea agreement, and the defendant would be able to withdraw his

14  plea.

15      The defendant understands, as outlined in Paragraph

16  6, that as a result of this guilty plea today, he'll be

17  required to register as a sex offender under the Sex Offender

18  Registration and Notification Act.

19      The parties have entered a series of sentencing

20  guidelines stipulations, which are outlined in Paragraph 13 of

21  the written guilty plea agreement.  And the parties understand

22  that those are not binding on either the Court or the Probation

23  Office.

24      However, other than discussed, pursuant to the

25  11(c)(1)(C) agreement and Your Honor's inclination to accept

1  that or not, the defendant may not withdraw his guilty plea for

2  any other reason, and he may not withdraw his plea because the

3  Court declines to follow any recommendation, motion, or

4  stipulation by the parties to this agreement.  And no one has

5  promised or guaranteed to the defendant what sentence this

6  Court will impose.

7          I understand Your Honor will review the appellate

8  waiver provisions with the defendant.  Those are outlined in

9  Paragraphs 15 and 16 of this agreement.

10         And as Your Honor already mentioned, the defendant

11 has also agreed to forfeiture as part of this agreement,

12 specifically to forfeit his cellular phone that was seized, as

13 well as his Dell laptop, which was seized.  And both of those

14 are identified with specificity in the plea agreement, as well

15 as in the indictment.

16         The parties have reduced all of our agreements to

17 writing in this agreement.  And there are no agreements outside

18 of this.

19         And that would summarize the essential terms, Your

20 Honor.

21         THE COURT:  Thank you.

22         I'm going through your recitation, which we'll talk

23 about in a couple of minutes, and your facts, but I want to be

24 clear on something, because I didn't see it.  Is there a -- is

25 there a connection between a student in this District and this

1  defendant for venue purposes?

2          MS. HARRELL:  Yes, Your Honor.  And -- well, there's

3  -- and there's a connection between the defendant and his co-

4  conspirator Andrew Wolf, who was present --

5          THE COURT:  Oh, in this District.

6          MS. HARRELL:  -- in the Eastern District.

7          THE COURT:  Okay.

8          MS. HARRELL:  Of course living here and teaching

9  school here --

10          THE COURT:  Okay.

11          MS. HARRELL:  -- for the duration of the conspiracy.

12          THE COURT:  Okay.

13          MS. HARRELL:  So that's where the venue for this

14  District comes from, Your Honor.

15          Similarly, the --

16          THE COURT:  But the -- but -- and Wolf, of course,

17  would be -- the victims would be in this District.

18          MS. HARRELL:  Correct.  At least one of Mr. Knauss's

19  victims was in this District.

20          And with respect to the receipt charge in Count 3,

21  the images that Mr. Knauss is charged with receiving were

22  distributed by Mr. Wolf out of the Eastern District of

23  Pennsylvania.

24          THE COURT:  Okay, all right.  Thank you very much.

25          MS. HARRELL:  Yes.

19

1          THE COURT:  Mr. Dreyer, have you had a chance to

2  review those terms as just described by the United States with

3  Mr. Knauss?

4          MR. DREYER:  Yes, I have, Your Honor.

5          THE COURT:  Are you aware of any agreements or

6  conditions, other than set forth in the plea agreement, and I

7  will otherwise address it?

8          MR. DREYER:  I am not.

9          THE COURT:  Okay; thank you.

10          Mr. Knauss, has anyone promised you or offered you

11  anything other than what's in this agreement?

12          MR. KNAUSS:  No.

13          THE COURT:  Okay.  Do you understand, sir, on the

14  basis of a guilty plea, I could sentence you up to a maximum

15  amount set by United States Congress?

16          MR. KNAUSS:  Yes.

17          THE COURT:  Let me just remind you what that is, and

18  putting aside your agreement for a moment, all right?  Because,

19  you know, you have an agreement, but I have the ability to not

20  accept that agreement and to find there is an appropriate

21  sentence that's outside that agreement.  So let me say what

22  that is.  Congress tells me that I could impose sentence up to

23  70 years in prison, followed by a 15-year mandatory minimum

24  term -- with a mandatory minimum of 15 years.  So, 15 would be

25  mandatory of the 70 years.  A mandatory minimum five years of

1  supervised release, up to a lifetime of supervised release.  A

2  $750,000 fine, a $300 special assessment.  Mandatory

3  restitution, as counsel just described.  And if I found you to

4  be non-indigent, an additional $15,000 in special assessments,

5  and up to $120,000 additional assessments under various --

6  under two other acts, as well as restitution.

7           Do you know what I mean by those terms?  Sir, do you

8  know what supervised release means?

9           MR. KNAUSS:  Yes.

10           THE COURT:  Okay.  So supervised release -- in

11  addition, there are special assessments, as well, for each

12  count, $100 for each count of conviction.

13           Supervised release, sir, is something interesting

14  that I just want to clarify with you.  It is a term of sentence

15  after you finish incarceration in which you're under

16  supervision of our officers.  And should you violate those

17  terms, you'll be back in front of us for another sentence.  Do

18  you understand that, sir?

19           MR. KNAUSS:  Yes.

20           THE COURT:  Okay.  Sir, no one can guarantee you what

21  sentence you'll get from me.  So if I accept your -- if I

22  accept counsel's recommendation and your recommendation, and I

23  sentence you in that range, okay, then you know that.

24           But if I reject it, and you decide to go to trial,

25  and you're convicted at that stage, if I impose a more severe

1  sentence than you expect, then you cannot withdraw your guilty

2  plea at that stage should you do one, do you understand that?

3              MR. KNAUSS:  Yes.

4              THE COURT:  So, let me tell you how this works.  I

5  will hear from counsel today, and I will decide whether, based

6  on what I know today, this sentencing range is appropriate --

7  the recommended range is appropriate.  If I accept it, then you

8  know going into a sentencing in October that you will have a

9  certain range of months of incarceration, including the time,

10 hopefully time served that you're already serving.  Because

11 you're presently in custody, is that correct, sir?

12             MR. KNAUSS:  Yes.

13             THE COURT:  Okay.  So -- if, however, I reject that

14 plea, and I say, "No, you've got to come back with another

15 recommendation."  Or -- I don't negotiate, "I say, no, that

16 doesn't work for me."  Then you, for all intents and purposes,

17 will go to trial on August 27th.

18             Or you could say, "Judge, you know what, I get it.

19 I'm still going to let you decide my fate.  I do not need to go

20 to the jury on August 27th.  I'll let you decide what an

21 appropriate sentence is going to be."  In which case, you'll go

22 forward with your guilty plea.  Do you understand that, sir?

23             MR. KNAUSS:  Yes.

24             THE COURT:  Okay.  Mr. Dreyer, have you had a chance

25 to explain the sentencing guidelines to Mr. Knauss?

22

1          MR. DREYER:  Yes, I have, Your Honor.

2          THE COURT:  Okay.  And how they affect his case?

3          MR. DREYER:  Yes.

4          THE COURT:  All right.  So, Mr. Knauss, I just told

5  you about what the United States Congress tells us is an

6  appropriate sentence.

7          Let me tell you about something called the United

8  States Sentencing Commission.  The United States Sentencing

9  Commission is made up of men and women nominated by the

10  President and confirmed by the United States Senate, who are

11  charged with the obligation of reviewing all the cases in the

12  United States, all the federal cases, and coming up with the

13  sentences or a range of months that seems to be proportional

14  across the United States.  It would be fundamentally unfair to

15  you to get a much greater sentence because you're in front of

16  me than someone else.  And it also may be fundamentally unfair

17  to people who are incarcerated now to have a substantially

18  longer sentence than you receive if they engaged in the same

19  conduct.

20          So guidelines are just guidelines, they're not

21  mandatory on us.  But they sort of help us understand where the

22  world is on those issues so that you're not being overly

23  punished or not appropriately punished, given the guidelines.

24          When we get to sentencing in October, I will hear

25  from counsel and decide what an appropriate sentence should be

1  after I decide whether the range is appropriate, and after I

2  decide whether there's any grounds to go below that range.

3  Counsel can make those arguments.  I can go above or below, if

4  I go forward outside that guidelines range -- the recommended

5  guidelines range.  But I assure you, you will know why we are

6  going with the sentence.  I will give you the specific reasons

7  why I'm giving you an appropriate sentence in my mind.

8          I also assure you of something else.  I will not have

9  made up my mind about the sentence until I'm on the bench.  I

10  do not come on the bench with an idea of a sentence.  I come on

11  the bench as a hearing, to hear what you have to say, and hear

12  what the United States has to say, and your counsel, and any

13  character witnesses you wish to present, including any

14  statement you'd like to make if you wish to.  So that's how it

15  works.

16          In this context, it means that if I accept the range

17  of months recommended by the United States and your counsel,

18  then I would be looking at a time period in that range.  I may

19  also say, "No, I'm not going to do that." I will decide that as

20  soon as I can after I hear the evidence today, and maybe

21  shortly thereafter.  So you will know in plenty enough time to

22  decide what to do.  I certainly won't make you decide that at

23  the day of sentencing.  You will know that before then.  If not

24  today, you'll certainly know that relatively quickly, and

25  certainly long before your October 22 sentencing.

24

1          Okay, all right.  I talked to you already about

2   supervised release, what's been referred to as supervised

3   release.  We already described that.

4          So, here's what happens, sir.  I don't know what an

5   appropriate sentence is because I don't have a chance to sit

6   down and interview you.  And if I had the luxury of doing that,

7   the time luxury of doing that, I would love to come and sit and

8   talk to you for a couple of hours and figure out what's going

9   on here.  Sentencing is, by far, the most personal thing a

10  Federal Judge does.  And it would be better if I could sit and

11  talk to you and understand exactly what's going on here,

12  especially a sentence, the kind -- the years of which you're

13  looking at.

14          But, instead of me coming, we send a probation

15  officer out.  That officer does not work for the attorneys,

16  does not work for the United States Attorney's Office, does not

17  work for your lawyer.  That person works for the courts, and

18  that person is essentially our representative.  So when you're

19  talking to that person, you're talking to me, in some sense,

20  and the person is going to prepare a presentence investigation

21  report.  This is a detailed report.  It talks all about your

22  background.  It talks about your history, the actions that led

23  up to the conduct, and your future.  What's next?  What kind of

24  treatment do you need?  Things along those kind of lines.  It

25  is a very detailed document.  And I assure you, when you come

1  out here for sentencing, you're going to see all kinds of

2  Post-It notes on it of highlights and my questions about it

3  because it's the only introduction I have to you.  Here's two

4  unique things about it:

5          One is, whatever happens to you for sentencing, that

6  document will likely follow you, so you want to make sure it's

7  accurate.  You want to make sure, for example, if you have

8  family members, or someone who wants to visit you, that it's in

9  there.  Okay?  It's essentially the book on you.  They probably

10 won't get this transcript, they don't look at much else, the

11 Bureau of Prisons, but they will look at that document,

12 typically.  So it becomes most important that it's accurate.

13         And for your purposes, that means in this most unique

14 way, you get to see the document before I do.  There's nowhere

15 else in the system where you get to see a document before

16 somebody who works for the courts gives it to me.  So you're

17 going to see it before I do.  And if there's something

18 inaccurate there or incorrect, your counsel has the opportunity

19 to ask the officer to correct that.  He'll say, "Hey, there's a

20 mistake there," and get it corrected.  Or maybe not get it

21 correct, maybe the officer disagrees.  In which case, your

22 counsel can come here to me at our hearing and say, "Your

23 Honor, I think Paragraph 122 is incorrect.  This isn't true."

24 And I'll hear evidence, and hear argument, and will decide what

25 is appropriate.

1            But it's my role to make sure that presentence
2   investigation report is accurate and the facts in there are
3   truthful.  And so you get the first shot at making sure that's
4   true.  I assure you, sir, that not everything in that report
5   you're going to like; you can appreciate that.  But there's
6   going to be things in there you want to be accurate.  Okay?
7   Don't fall on a sword.  Don't say, "Oh, it's all bad."  Don't
8   let the anxiety and the fear of the unknown say, "I'm going to
9   agree to things that are in there that aren't true."  Because
10  years from now, as you're finishing up your sentence, you want
11  to make sure it's accurate.

12            I have many cases, sir, where, unfortunately, the
13  young men and women then at their age didn't do that.  And then
14  they're getting out, their sentence is ending, and there's no
15  idea what to do with those folks because they never told us in
16  1996, 1997, or 2005 or 2013 what their next step was.

17            And so it's important that we think about the future,
18  and it's important you put in there some idea of what you want
19  to do next.  Where you want to live; what you want to do, those
20  types of things.

21            Okay.  So when you come before me at sentencing, I'm
22  going to have that report, and we're going to discuss it.  And
23  at sentencing then, I'm going to set the range, and I'm going
24  to hear evidence about what the appropriate sentence should be.
25  And then I'm going to give you the sentence with my reasons.

1  Do you understand that, sir?

2          MR. KNAUSS:  Yes.

3          THE COURT:  Okay.  What's really happening if you

4  plead guilty today, sir, is you're saying, "You know, I don't

5  need to go to trial.  I don't need to burden the United

6  States's tax dollars.  I don't need to take the time of these

7  lawyers.  I don't need to take the time of the Court.  Because

8  I'm going to admit my guilt."  But in doing so, you're waiving

9  valuable constitutional rights that I want to remind you of

10 before you go much further.

11          Sitting there today, you are presumed innocent.  That

12 is not guilty.  Let me remind you, sir, no one is innocent.

13 That's a nomenclature of the law.  In the classic sense, no one

14 is innocent.  We are guilty or not guilty.  You are not -- in

15 the Acknowledgment of Rights you signed, we reviewed these

16 issues.  So we are presumed not guilty.  And the United States

17 must prove, beyond a reasonable doubt, each element of the

18 offenses against you.  And if it does not, then I will dismiss

19 the charge against you or the jury could find not enough

20 evidence against you.

21          When you get to trial, the burden is always and

22 entirely on the United States; we'll talk about that in a

23 couple moments.  In most cases, sir, with people like you, as

24 your counsel I'm sure has told you, your able counsel has told

25 you, the only time I ever hear the defendant's voice is "good

1   morning, Your Honor" or "good afternoon, Your Honor."  It's the

2   only time I hear his voice.  And a jury never hears his voice.

3   And that's okay -- or her voice.  And that's entirely

4   appropriate; I'll tell you in a moment why.

5         You have the right to assistance of a lawyer at every

6   stage of the proceedings, as you do today, during any trial,

7   any post trial, and any appeal.  And if you cannot afford an

8   attorney, one will be appointed for you on the taxpayer's

9   behalf.

10         You have the right to challenge before trial the

11   manner in which the United States obtained evidence against

12   you, and that's called suppression.  And if we believe the

13   United States improperly obtained evidence against you, we make

14   that finding.  No one will hear that evidence.  The jury will

15   never see that evidence because we find it was obtained -- it

16   was obtained from you in violation of your constitutional

17   rights.

18         You have the right to plead not guilty, of course,

19   and have your case heard by 12 persons.  Those 12 persons are

20   chosen from Philadelphia and the eight surrounding counties.

21         You have the right to turn around in your chair and,

22   along with your counsel, choose the 12 people who will be on

23   that jury, plus two alternates.  You have the right to look at

24   them, the right to see them, the right to know some of their

25   background, to ask questions about them, and then choose who

1 will be your judges at your trial.  It's so important because I

2 don't make the decision; they do.  And that's rare in the sense

3 that you get to pick your judge.

4          But here's what's even rarer.  Those 12 people must

5 be unanimous.  That is they must all find that the United

6 States has proven your guilt on each element beyond a

7 reasonable doubt.  So, if they don't find unanimously your

8 guilt, they can find one or two things:

9          They can find what we call a hung jury, and they say

10 some people agree and some people don't.  In which case, we may

11 have another trial.

12          Or they could find entirely in your behalf.  All 12

13 could agree that the United States has not proven their case

14 beyond a reasonable doubt -- its case beyond a reasonable

15 doubt.  In which case, subject to any detainers from other

16 jurisdictions, you will be released.

17          At trial, the Government has to prove its case beyond

18 a reasonable doubt, and they do that by presenting witnesses on

19 that witness stand.  You have a chance to look at and see, what

20 the law calls "confront them."  Your counsel gets to cross-

21 examine them; show they may have bias; impeach them in some way

22 to demonstrate that there's a problem in the manner in which

23 they are presenting their evidence.

24          You could present your own witnesses at trial,

25 including character witnesses whose testimony alone could

1 convince one of those jurors that you're not guilty on the

2 charge brought against you.  And thus, maybe hang that jury,

3 and so have a new trial.

4          So you say, "How do I get my witnesses there?"  Well,

5 you could obtain a subpoena from the Court, your counsel can.

6 And that's a Court Order that requires witnesses to come and

7 appear and testify on your behalf.  And if they don't appear,

8 we send out the United States Marshals and they go get them,

9 and they bring them in here, and they testify under oath.

10          You have the right to testify if you wish to in your

11 own trial.  But under the Fifth Amendment of the United States

12 Constitution, you do not have to testify or take the witness

13 stand in a criminal case.  No one can force you to do that.

14 The United States Attorney, nor no one else, can mention the

15 fact that you did not take the stand.

16          All I will do is repeatedly tell the jury they can

17 draw no adverse inference from the fact you did not testify.

18 That it is your constitutional right not to testify because the

19 burden is always on the United States to prove its case beyond

20 a reasonable doubt.  If it doesn't, it loses, and you get to be

21 released.

22          No one will mention it other than me telling the jury

23 that fact.  I tell them that fact because common sense tells

24 you and me that jury is going to wonder, "Why isn't this guy

25 testifying?"  Well, you have every constitutional right not to

1 | testify.

2 | If the jury found you guilty, you could appeal that

3 | finding of guilt to our Court of Appeals, which could, in its

4 | judgment and wisdom, set aside the finding of guilt, or set

5 | aside some finding of guilt, or order a new trial, in which

6 | case we would do it again.  Or could just vacate the

7 | conviction, find you -- and acquit you -- direct me into acquit

8 | you.

9 | Do you understand those rights, sir, as I just

10 | explained them to you?

11 | MR. KNAUSS:  Yes.

12 | THE COURT:  Do you have any question about any of

13 | them?

14 | MR. KNAUSS:  No.

15 | THE COURT:  Okay.  Do you understand, sir, that by

16 | pleading guilty, you're giving up those rights to a trial?

17 | MR. KNAUSS:  Yes.

18 | THE COURT:  In addition, sir, under your agreement --

19 | the plea agreement that you just reviewed with your counsel,

20 | you've agreed to severely limit your appellate rights, and let

21 | me talk about that.  So if I accept this recommended sentence,

22 | and, again, the recommended sentence from your counsel and the

23 | United States is a sentence of imprisonment of 262 to 274

24 | months, followed by at least 15 years of supervised release,

25 | and a $300 special assessment, in addition to the forfeiture

1   and the restitution, as well as a special assessment.

2          So if I do not accept that recommendation to me, you

3   can, of course, go to trial or decide to go forward with me at

4   sentencing.  One or the other.

5          But if I do accept it, and you plead -- and after you

6   plead guilty, you're -- you -- you now have your guilty plea,

7   and you cannot withdraw your guilty plea.  For instance, if you

8   don't like what's in the presentence investigation report, you

9   can't take back your guilty plea.  Do you understand that, sir?

10          MR. KNAUSS:  Yes.

11          THE COURT:  Okay.  So, in the event that I accept

12  your recommendation, and we move forward and go to a sentencing

13  under that recommendation, you are agreeing in this agreement,

14  sir, that you will not appeal the sentence.  First of all, you

15  won't appeal what happened here, and you won't appeal the

16  sentence.  You won't challenge it.  You won't be able to do

17  anything about it, except in five limited instances:

18          First, if the United States appeals, then you can

19  appeal.  For some reason, if the United States appeals, then

20  you can appeal.

21          I don't know what the guidelines are going to --

22  well, I know what Congress tells me.  But if I sentence you to

23  higher than what Congress told me, you could appeal that.  If I

24  sentence you higher than what the guidelines tell me, you could

25  appeal that, either by way of a variance or a departure upward.

1  You could, in either case, appeal that.  You could say, "Wait a

2  second."  That's why the guidelines are so important, Mr.

3  Knauss, because the guidelines set the range.  And if I'm going

4  higher, you have the right to appeal that to the Court of

5  Appeals.  I don't know what those guidelines are going to be at

6  this stage, sir.  I know that counsel have reached a

7  stipulation about range, about points, and things like that,

8  but I don't know what that's going to equal at this stage.

9        Lastly, you have the right to appeal should you

10  believe that your counsel provides you constitutionally

11  ineffective assistance of counsel.  In other words, it's not

12  really an appeal.  It's a separate proceeding, subject to the

13  conditions you've reached in this agreement, to challenge the

14  way your counsel represented you at trial and/or in a plea or

15  during the course of representation.

16        But other than those challenges, you cannot appeal

17  what happens in your sentence.  Do you understand that, sir?

18        MR. KNAUSS:  Yes.

19        THE COURT:  So, do you understand, sir, if I accept

20  this agreement, and if we go to plea, and we go to sentencing,

21  and I sentence you within that range, you really cannot go

22  forward other than those limited instances on appeal?

23        MR. KNAUSS:  Yes.

24        THE COURT:  Okay.  And, in fact, if I accept that

25  range, it would be impossible for you to challenge the fact of

1 the amount of months I sentence you because you agreed to it,

2 do you understand that?

3          MR. KNAUSS:  Yes.

4          THE COURT:  Okay.  So, sir, it becomes most important

5 for me to ask now whether the decision to plead guilty, should

6 you do it, is your decision alone, and not the decision of

7 anyone else, including your lawyer, forced upon you?

8          MR. KNAUSS:  It's mine.

9          THE COURT:  No one's forced you to make this

10 decision.

11          MR. KNAUSS:  Nope.

12          THE COURT:  Your lawyer hasn't said "you must make

13 this decision"?

14          MR. KNAUSS:  No.

15          THE COURT:  Okay.  So now I turn to the phase in a

16 plea hearing, sir, where I'm trying to understand what is

17 exactly the evidence against you, right?  And you may not

18 believe this, Mr. Knauss, from your background, but people

19 actually plead guilty to crimes they didn't commit.  It may be

20 to protect family members or loved ones; you can imagine that.

21 And so it's my role to make sure that you actually did the

22 crime that you're -- that may be before me.

23          So, the first thing I'm going to do is ask the United

24 States to tell me the elements of the offense.  That is what

25 Congress tells us the United States must prove in order to find

1  you guilty.  When the United States has done that, I'm going to

2  ask her to take a moment, and ask you if you understand that.

3      But then I'm going to ask her to tell us the facts

4  that she believes she would prove to me and to the jury to find

5  you guilty.

6      Ms. Harrell, would you kindly summarize the elements

7  of the offenses charged in the indictment to which Mr. Knauss

8  is considering pleading guilty?

9      MS. HARRELL:  Yes, Your Honor.  With respect to

10  Count 1, charging the defendant with conspiracy to manufacture

11  child pornography, the Government is required to prove that two

12  or more persons agreed to commit the offense of manufacturing

13  child pornography, which prohibits using, persuading, inducing,

14  enticing, or coercing a minor to engage in sexually explicit

15  conduct for the purpose of producing any visual depiction of

16  such conduct; and the visual depiction was mailed or actually

17  transported in interstate or foreign commerce; or that the

18  defendant knew or had reason to know that the visual depiction

19  would be mailed or transported in interstate or foreign

20  commerce; or that the visual depiction was produced using

21  materials that have been mailed, shipped, or transported in

22  interstate or foreign commerce.

23      The Government would also have to prove that the

24  defendant was a party to or member of that agreement, and that

25  the defendant joined the agreement or conspiracy knowing of its

36

1  objective to manufacture child pornography, and intending to

2  join together with at least one other conspirator to achieve

3  that objective.

4          With respect to Count 2, charging the defendant with

5  conspiracy to receive and distribute child pornography, the

6  Government is required to prove, again, that two or more

7  persons agreed to commit the offense of receiving and

8  distributing child pornography; that the defendant was a party

9  to or member of that agreement; and that the defendant joined

10  the agreement or conspiracy knowing of its objective to receive

11  and distribute child pornography, and intending to join

12  together with at least one other conspirator to achieve that

13  objective.

14          And with respect to Count 3, charging the defendant

15  with receipt of child pornography, the Government is required

16  to prove that the defendant knowingly received any child

17  pornography.  That is any visual depiction that involved the

18  use of a minor engaging in sexually explicit conduct; and that

19  visual depiction is of such conduct that has been mailed,

20  shipped, or transported in interstate or foreign commerce by

21  any means, including by computer, or which was produced using

22  materials which have been mailed, shipped, or transported by

23  any means, including by computer.

24          THE COURT:  Thank you.

25          Counsel, have you had an opportunity to explain the

1  nature and elements of the offense with Mr. Knauss?

2          MR. DREYER:  Yes, I have, Your Honor.

3          THE COURT:  All right.

4          Mr. Knauss, has your counsel explained to you the

5  nature and the elements of the charges -- of the elements of

6  the charges against you?

7          MR. KNAUSS:  Yes.

8          THE COURT:  Okay.  Did you have any questions of me

9  about any of the words you just heard regarding the elements of

10 these charges?

11         MR. KNAUSS:  No.

12         THE COURT:  Okay.  I'm now going to ask Ms. Harrell

13 on behalf of the United States to recite the facts in summary

14 fashion, which she believes will persuade me that she could

15 prove your guilt beyond a reasonable doubt on each of these

16 offenses.  I want you to listen carefully, because when she has

17 finished her summary, and incorporating what she's already

18 written in her memorandum, which you -- have you read her

19 memorandum?  Her guilty plea memorandum.

20         MR. KNAUSS:  Yes.

21         THE COURT:  Okay.  When she's finished with that, I'm

22 going to ask you if you did what the United States says you

23 did.

24         Ms. Harrell, would you kindly summarize what you

25 believe the facts would show Mr. Knauss guilty of the three

38

1  charges?

2          MS. HARRELL:  Yes, Your Honor.

3          In Counts 1 and 2, the defendant is charged in his

4  indictment with conspiring with Persons Number 1 and 2.  Person

5  Number 1 is identified as Andrew Wolf, and Person Number 2 is

6  identified as Kray Strange.  They were, of course, charged

7  elsewhere, pled guilty, and sentenced by Your Honor.

8          Between May of 2020 and October 7th of 2021, Andrew

9  Wolf, a teacher at Springside Chestnut Hill Academy in

10 Philadelphia, and Kray Strange, a young adult from Carthage,

11 New York, operated an elaborate online child exploitation

12 catfishing scheme to entice minor boys to self-produce sexually

13 explicit images and send them primarily to Strange, but

14 sometimes to Wolf over the Internet.

15         To carry out this scheme, Strange assumed the online

16 personas of a minor teen girl named Alex Zampini (phonetic) or

17 Leslie Hanson (phonetic), depending on the scenario.  Strange

18 also sometimes impersonated a minor boy when targeting boy

19 victims he believed to be gay.

20         Mr. Strange used his minor girl persona to target

21 boys primarily on Snapchat and sometimes on Instagram.  He then

22 enticed the boys to self-produce and send him sexually explicit

23 images by distributing images of minor girls engaged in

24 sexually explicit conduct, which Mr. Strange claimed were

25 pictures and videos of Alex or Leslie, and sometimes by

1    engaging the boys in games of truth or dare.

2            Mr. Strange also provided his victims with specific

3    instructions about the kinds of pictures and videos he wanted.

4            Beginning around July of 2020, Mr. Wolf and Mr.

5    Strange began discussing Strange catfishing or baiting Mr.

6    Wolf's own minor students at Springside Chestnut Hill Academy,

7    but they did not limit their activities to victimizing Mr.

8    Wolf's students.

9            Wolf's conduct came to light after a cyber tip on his

10   Dropbox account was investigated by FBI Philadelphia, and he

11   was arrested on a federal complaint and warrant related to that

12   conduct on October 7th of 2021.  Mr. Strange was identified as

13   Wolf's co-conspirator in December of 2021.

14           The evidence of Mr. Wolf and Strange's scheme came

15   primarily from their Telegram communications, which were

16   extracted from Mr. Wolf's cell phone at the time of his arrest,

17   as well as corroboration from victim interviews.  Mr. Wolf and

18   Strange engaged in private Telegram conversations for nearly 18

19   months, between approximately May 2nd of 2020 through October

20   7th of 2021, the date of Wolf's arrest, and they communicated

21   almost every day during this time.

22           Their scheme to catfish or bait minor boys to

23   manufacture child pornography also involved other offenders,

24   like this defendant, Patrick Knauss.

25           In addition to Mr. Wolf's students, the conspiracy

1  targeted boys with large social media followings, such as

2  Little League World Series players and other successful

3  athletes, among other victims.

4       In the same way the FBI extracted the communications

5  between Wolf and Strange from within the Telegram application

6  on Wolf's cell phone, the FBI obtained Telegram communications

7  between Wolf and Knauss and Wolf, Strange and Knauss.

8       Mr. Knauss and Mr. Wolf began communicating at least

9  as early as 2018 after Mr. Knauss contacted Wolf via email as a

10  fan of Mr. Wolf's erotic pedophile fiction, which were short

11  stories that often portrayed adult men raping minor boys that

12  Mr. Wolf published on a website called "Nifty" under the pen

13  name Owen Davis.

14       After exchanging fan mail with Mr. Knauss, Wolf began

15  communicating on Telegram with Knauss in August of 2019.

16  Eventually, Mr. Wolf introduced Mr. Knauss to Strange on

17  Telegram, and the three of them participated in a group chat

18  that Mr. Wolf administered called "Boy Oh Boy" in which they

19  traded child pornography, provided social media handles of

20  minor boys for Strange to target or catfish, and discussed

21  Strange's efforts, including sometimes providing specific

22  instructions about what kinds of videos and images to entice

23  the boys to self-produce.

24       Throughout their communications, Mr. Wolf worked as a

25  middle school teacher at Springside Chestnut Hill and lived at

41

1  his residence in Philadelphia.

2          Within the Telegram application on Mr. Wolf's phone,

3  a private chat was identified between Mr. Wolf, using the

4  moniker, Mr. P, and a Telegram user with a display name P.K.,

5  who was later identified as the defendant.  The chat between

6  Mr. Wolf and P.K. took place between approximately August 11th

7  of 2019 and September 27th of 2021.  That chat contained

8  approximately 7,230 messages, over more than 1,500 pages of

9  communications.  Approximately 969 messages appeared to be

10 image or video files.  But due to Wolf's iPhone being processed

11 while it was disconnected from all networks, any image and

12 video content not stored locally on Mr. Wolf's phone did not

13 appear in the forensic extraction, and any such content was

14 designated in the extraction as an empty file.  Approximately

15 964 of those image and video files were empty files, and the

16 five files that contained viewable content did not depict child

17 pornography.  Those viewable files were school photographs of

18 some of Mr. Wolf's students to be targeted.

19         In August of 2019, P.K. and Wolf began discussing

20 sexually exploiting Mr. Wolf's students.  First, P.K. asked

21 Wolf if he had ever stalked his students' Instagram profiles,

22 to which Wolf responded "No."  P.K. offered to help Wolf look

23 up his students if Wolf was willing to pass along their names.

24 Wolf provided P.K. with certain students' names and social

25 media accounts.

1          Although there were no viewable files of child

2    pornography in the Telegram messages extracted from Wolf's

3    phone, the context of the chats indicates that many of the

4    files exchanged were of minor boys engaging in masturbation,

5    exposing their genitals, and posing nude.

6          For example, on September 2nd of 2020, Mr. Wolf sent

7    multiple image files, which appeared as empty files in the

8    forensic extraction, with the message, "Look at" a specific

9    minor student's "ass here."

10         In the Telegram chat, P.K. and Mr. Wolf openly

11   discussed Alex, who had been identified as Kray Strange, and

12   his efforts to obtain sexually explicit images and videos from

13   minors by catfishing or baiting them.

14         P.K. also told Wolf that he sent several names to

15   Alex to bait.

16         Mr. Wolf discussed starting a group chat that

17   included himself, P.K., and Alex, specifically intended to bait

18   boys.  P.K. told Wolf that he used to bait, but no longer did

19   so because, quote, "life got busy."

20         P.K. also regularly asked to receive specific types

21   of child pornography, particularly images of violence and

22   force.

23         For example, on August 14th of 2019, P.K. asked for

24   "any rape or bondage shit."

25         On August 18th of 2019, he asked, "Got any forced

1  stuff?"

2          On November 9th of 2019, he said, "I'd love to find a

3  good long abuse vid."

4          On December 1st of 2019, he asked, "Hey, you happen

5  to have any vids?"

6          On March 10th of 2020, he asked, "I need some BDSM

7  boys."

8          On April 13th of 2020, he said, "I need more boy

9  bondage."

10          On August 29th of 2020, he asked, "Also, random

11  question, but you know of any good forced vids or piss?"

12          On September 30th of 2020, he said, "I need sexy

13  baseball boys."

14          Within the Telegram application on Wolf's phone, a

15  group chat was also identified between Wolf, also, again,

16  operating the moniker Mr. P., Strange, operating the moniker

17  Alex I B H H J L, and Knauss, operating under the moniker P.K.

18  This group chat took place between approximately December 3rd

19  of 2020 and October 4th of 2021.  The group chat's purpose was

20  for trading child pornography and discussing boys for Strange

21  to victimize.  This chat contained approximately 1,770

22  messages, over more than 350 pages of communications.  Of

23  these, approximately 130 messages appeared to be image or video

24  files.

25          In the forensic extraction of Wolf's phone,

1  approximately 76 files were empty files, and their content was

2  not viewable.

3         However, 54 of the files contained content that could

4  be viewed.  And of those 54, seven videos and four images

5  depict child pornography.

6         Wolf created the group chat and named it "Boy Oh

7  Boy."  On December 3rd of 2020, the chat began with Wolf

8  introducing Alex and P.K., writing, "Hey, Alex, remember P.K.?

9  He wanted to say hi."

10        P.K. suggested, "Thought we could chat about who to

11 bait, etc."

12        Throughout that group chat, the defendant gave

13 Strange instructions and suggestions for baiting the minors.

14        For example, on December 3rd of 2020, P.K. wrote,

15 "You should reach out to him.  Ha ha.  Get one of them to piss

16 their pants.  Tell him to do it again minus the shirt and

17 shorts, just in his boxers."

18        On December 24th of 2020, he wrote, "I guess the best

19 plan is to bait Big Bro and get him to play with Lil Bro."

20        On January 7th of 2020, he wrote, "I could probably

21 send you, like, 10 names, at least, if you're bored.  Ha ha."

22        On January 17th of 2020, he wrote, "I want to see him

23 do it nude."

24        On April 29th of 2021, he wrote, "See if you can get

25 him to show his face."

1        On May 26th of 2021, he wrote, "Or make it a contest
2   among all of them" -- I'm sorry -- "among them all, who can
3   send the best pics/vids."

4        Throughout the chat, P.K. also provided more than 100
5   URLs of social media accounts belonging to boys who appear to
6   be minors.  Many of those URLs were specifically intended for
7   Strange to bait.  And throughout, P.K. repeatedly asked Strange
8   for updates on the minors to see if Strange had obtained
9   sexually explicit images from them.

10       For example, on September 22nd, 2021, P.K. sent the
11  Instagram handle of a 12-year-old identified minor, and
12  described the child as a little League World Series star, to
13  which Strange responded, "Yes, sir."

14       On September 22nd of 2021, Mr. Strange sent multiple
15  files of a boy he referred to a "C.M.," who remains
16  unidentified, and reported on his conversations with C.M.

17       First, Strange sent an 18-second long video depicting
18  a minor boy removing his shirt and posing in a manner to
19  display his penis, to which P.K. asked "Who dat?"

20       Strange responded, "C."

21       P.K. wrote, "Who?  Ha ha."

22       Strange responded, "He's just a boy."

23       P.K. wrote, "Oh, he's cute from what I can see."

24       Wolf, then wrote, "C," with a devil smiley emoji.

25       P.K. asked, "What else did C show you?"

1    Strange responded, "This is R.N." right now, and then

2  sent an eight-second long video depicting a close up of a minor

3  inserting a finger into his anus.  Towards the end of the

4  video, the camera angle moves up to expose the minor's penis.

5    P.K. asked, "How old is he?"

6    Strange responded, "He tells me 14, but he's in

7  seventh grade and just celebrated his 13th birthday."

8    P.K. asked, "Ah, any siblings?"

9    Strange then sent an image file, which now appears as

10  empty in the forensic extraction of Wolf's phone, and then sent

11  an image depicting a nude minor boy with his penis exposed

12  while laying on a bed and wrote "Sisters."

13    P.K. responded, "His ass is nice and tight.  Love

14  that belly button.  He'd be fun to play with.  Should get him

15  in his sister's panties."

16    Strange wrote, "His sister is an infant. LOL."

17    To which P.K. responded, "Oh.  Well, how was I

18  supposed to know?"

19    Strange then sent a seven-second long video depicting

20  a close up of a minor's penis while he masturbates and

21  ejaculates on himself while laying on a bed.  To which P.K.

22  responded, "What a waste of a shot.  All over his bed instead

23  of him.  Damn.  Nice load, though."

24    Strange wrote, "Agreed."

25    And Wolf responded, "I can't get enough C."

1        Strange then sent a four-second long video of a minor

2    boy stepping out of his underwear and displaying his penis, to

3    which P.K. responded, "He needs to show his face soon.  I bet

4    his come face is amazing."

5        To which Strange wrote, "I K," or I know, and sent a

6    three-second long video of a nude minor boy in what appears to

7    be his bedroom, exposing his face and penis to the camera.

8        P.K. wrote, "Oh damn.  Please tell me he's got more."

9        On September 27th of 2021, Wolf asked the group,

10   "Caps by someone named Twisted Cams.  Which one should I try

11   and download?"

12       To which P.K. responded, "All of them."

13       Wolf then sent a series of files to the group, many

14   of which now appear as empty files in the forensic extraction.

15   However, one video file and two images that were viewable do

16   depict child pornography.  Those include a 12-minute and 47-

17   second long video depicting a minor boy masturbating his penis

18   and anally penetrating himself with a stick; an image

19   containing a collage of screenshots from Omegle of a nude minor

20   boy masturbating his penis; and an image containing a collage

21   of screenshots from Omegle of a nude minor boy inserting a

22   finger into his anus.

23       P.K. responded, "Boy loves his ass.  If a boy

24   honestly thinks a girl wants that, they deserve to be baited."

25       On September 29th of 2021, Strange sent additional

48

1  files depicting C.M. with the message, "C is always horny."

2  These images included a five-second long video depicting a nude

3  minor boy ejaculating on himself, and an image depicting a nude

4  minor boy holding his exposed penis while laying on a bed.

5        During the private Telegram chat with Wolf, P.K.

6  provided specific details pertaining to his geographical

7  location and identity which assisted FBI in identifying him,

8  such as his correct age at the time, 30 years old; his birth

9  month, March; his whereabouts, Vermont; and his place of

10 employment, a ski resort.

11       On May 24th of 2020, P.K. created an Instagram user

12 name Zoey Madam to talk to a 15-year-old boy with Wolf.  The

13 Telegram chats demonstrate that Wolf was already chatting with

14 the boy on Instagram, using his own minor female persona and

15 invited P.K.'s girl persona to the Instagram chats after asking

16 P.K., "Give me a first name that I should call you."  To which

17 P.K. responded, "Zoey," and provided his Instagram handle as

18 Zoey Madam.

19       Through investigation, FBI determined that that

20 Instagram account was registered to the defendant's Google

21 email address, as well as a Verizon phone number subscribed in

22 his full name, and used the same LG cell phone, which was later

23 seized from the defendant during a state search warrant on his

24 residence in Vermont.

25       On May 4th of 2023, Vermont law enforcement executed

1 a state search warrant at Mr. Knauss's residence.  He answered

2 the door and agreed to be interviewed.  The interview was audio

3 recorded.

4          In summary, the defendant admitted to operating the

5 Zoey Madam Instagram account, which he claimed he deleted a

6 long time ago, estimating about two years before the interview.

7          He acknowledged general knowledge of an FBI

8 investigation in Philadelphia regarding child exploitation on

9 Telegram.  Mr. Knauss adopted the Telegram communications

10 between himself, and Wolf, and Strange.

11          He also acknowledged being involved in a baiting

12 scheme, but said that his role was only to occasionally find

13 the boys.  He claimed that he had stopped his child

14 exploitation activities many months earlier, and he had deleted

15 his child pornography.

16          Law enforcement seized several electronic devices

17 during the search warrant, including the defendant's LG cell

18 phone, two laptops, a hard drive, and several thumb drives.

19          Mr. Knauss's LG cell phone contained at least 17

20 unique cached images of child pornography.  Thirteen of those

21 depict a minor boy, approximately 13 to 14 years old, exposing

22 his penis or anus.  Six of those images appeared identical to

23 the images and videos of C.M. that Strange distributed in the

24 Telegram group chat to Knauss and Wolf.  And three of those

25 images appeared identical to the images that Wolf distributed

1   to Knauss and Strange in the Telegram group chat on September

2   27th of '21.

3            The phone also contained three cached images, not

4   child pornography, of Mr. Wolf's students from Springside

5   Chestnut Hill Academy, as well as cached images of files,

6   again, not child pornography, that Mr. Knauss sent to Wolf and

7   Strange in the Telegram group chat.

8            The phone contained evidence of approximately 745

9   visits to the Nifty archive website between February 3rd, 2023

10  and May 3rd of 2023.  And there was also a Chrome autofill

11  identified for the keywords Owen Davis, which was Wolf's

12  moniker on Nifty.

13           Mr. Knauss's Dell Inspiron laptop also contained

14  evidence of images of child pornography in cached space.

15           And, Your Honor, that would be a summary of the facts

16  and evidence that the Government would introduce at trial in

17  this matter.

18           THE COURT:  Thank you.

19           Mr. Knauss, did you hear what the attorney for the

20  United States said she would be able to prove at trial relating

21  to your conduct?

22           MR. KNAUSS:  Yes.

23           THE COURT:  Is that what happened as it relates to

24  you?

25           MR. KNAUSS:  Yes.

1          THE COURT:  Did you do what the United States says

2   you did?

3          MR. KNAUSS:  Yes.

4          THE COURT:  Turning to each counsel seriatim, first

5   the United States, are you satisfied that there's a fact basis

6   today for the plea?

7          MS. HARRELL:  Yes, Your Honor.

8          THE COURT:  Counsel?

9          MR. DREYER:  Yes, Your Honor.

10          THE COURT:  Are you satisfied that Mr. Knauss is

11   today competent to enter a plea?

12          MS. HARRELL:  Yes, Your Honor.

13          MR. DREYER:  I am, Your Honor.

14          THE COURT:  Are you satisfied that Mr. Knauss's

15   willingness to plead guilty, should he do so, would be

16   voluntary?

17          MS. HARRELL:  Yes, Your Honor.

18          MR. DREYER:  It is, Your Honor.

19          THE COURT:  Okay.  Are you satisfied that a plea, if

20   made, is not based on any agreement or promise other than

21   contained in the plea agreement we've reviewed today?

22          MS. HARRELL:  Yes, Your Honor.

23          MR. DREYER:  I agree, Your Honor.

24          THE COURT:  Okay.  Are you satisfied that Mr. Knauss

25   has a full understanding of the nature of the charges against

1  him, the maximum possible penalties set by the United States

2  Congress, along with the mandatory minimum penalties set by the

3  United States Congress, and his legal rights to contest the

4  charge?

5          MS. HARRELL:  Yes, Your Honor.

6          MR. DREYER:  Yes, Your Honor.

7          THE COURT:  Okay; thank you, counsel.  You may be

8  seated.

9          Mr. Knauss, I have watched you carefully listen today

10 to what we're talking about.  I've watched you describe to me

11 what you've gone through after the arrest.

12         And I find today you are fully alert, and competent,

13 and capable of entering an informed plea.  I find that plea,

14 should you make it, would be knowing and voluntary, as you told

15 me it is, and not the result of any force or threat upon you,

16 or any promise, apart from that contained in your plea

17 agreement.

18         I find that the plea is supported by an independent

19 basis in fact containing each of the essential elements of the

20 offense to which the defendant would be pleading guilty.

21         I find you understand the charge.  I find you

22 understand the legal rights, the maximum possible penalty set

23 by Congress, and the mandatory minimum penalty set by Congress,

24 along with what supervised release means.

25         And I find that you understand if you plead guilty

1  that you're giving up your right to a trial.

2        I am going to tentatively accept the recommendation
3  of counsel for the range of sentence as described in their
4  agreement and as discussed with you.  That doesn't mean I won't
5  come back to you later on after I see the presentence
6  investigation report.  But based on what I heard today, I'm
7  comfortable with the range provided to me by counsel.

8        Sir, do you now wish to plead guilty to the charges
9  raised against you in the indictment?

10        MR. KNAUSS:  Yes.

11        THE COURT:  Okay.  Mr. Deputy, would you kindly take
12  the plea?

13        COURTROOM DEPUTY:  Please rise.  Patrick Knauss,
14  you have previously pleaded not guilty to Criminal Indictment
15  24-52, charging you with conspiracy to manufacture child
16  pornography in violation of Title 18, United States Code
17  Section 2251(a),(e), that's Count 1;

18        Conspiracy to receive and distribute child
19  pornography in violation of Title 18, United States Code
20  Section 2252(a)(2) and (b)(1), that's Count 2;

21        And receipt of child pornography in violation of
22  Title 18, United States Code Section 2252(a)(2) and (b)(1),
23  that's Count 3.

24        Now how you say, guilty or not guilty, as to Counts
25  1, 2, and 3?

54

1            MR. KNAUSS:  Guilty.

2            THE COURT:  You may be seated, sir; thank you.

3            Mr. Knauss, do you have any questions about anything

4    that happened here today?

5            MR. KNAUSS:  No.

6            THE COURT:  Do you understand that you pled guilty to

7    three federal felonies?

8            MR. KNAUSS:  Yes.

9            THE COURT:  Do you understand the evidence as

10   described by the United States?

11           MR. KNAUSS:  Yes.

12           THE COURT:  Okay.  Was everything you told me the

13   truth?

14           MR. KNAUSS:  Yes.

15           THE COURT:  Mr. Knauss, I accept your plea of guilty.

16   And I find and adjudge you, Patrick Knauss, guilty of the three

17   charges in the indictment against you.

18           Sentencing is set for October 22, 2024 at 12:15 p.m.

19   in this building.  I'm ordering -- as well, I'm ordering a

20   presentence investigation report today where an officer will

21   come -- one of our officers will come -- your counsel is

22   certainly invited to be there to meet with the officer to

23   prepare that presentence investigation report.

24           Anything further from the United States?

25           MS. HARRELL:  No; thank you, Your Honor.

1    THE COURT:  Anything further, Mr. Dreyer, from the

2  defense?

3    MR. DREYER:  No, Your Honor; thank you.

4    THE COURT:  All right; thank you.

5    Mr. Knauss, you'll wait --

6    MR. DREYER:  Good afternoon.

7    THE COURT:  You'll wait to hear from our probation

8  officer who will come to see you to prepare the presentence

9  investigation report.

10    Thank you very much.  Court is adjourn.

11    MR. DREYER:  Good afternoon, Your Honor; thank you.

12    THE COURT:  Thank you.

13    (Whereupon, at 12:00 p.m., the hearing was adjourned.)

14

15                    CERTIFICATE OF TRANSCRIBER

16    I, KAREN HARTMANN, a certified Electronic Court

17  Transcriber, certify that the foregoing is a correct transcript

18  from the electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21  *Karen Hartmann*

22

23  Karen Hartmann, AAERT CET 475  Date: October 17, 2024

24  TRANSCRIPTS PLUS, INC.

25